21-2739, Sherry L. VanNortwick in her capacity as personal representative of the estate of Claude Stephen versus Vendaya J. Wardenene, oral argument not to exceed 15 minutes per side. Mr. Desmond, vote for the plaintiff appellant. Good morning, your honors. Christopher Desmond on behalf of the plaintiff, the estate of Claude Stephens. Judge Cole, if I may, I'd like to reserve four minutes for rebuttal. Okay, that's fine. Your honors, as you're aware, this is a single issue appeal involving a single defendant arising out of the grant of summary judgment in a deliberate indifference case. The sole issue in front of the court today is whether or not Dr. J. Wardenene, and I apologize, whether or not there are genuine issues of material fact remaining regarding whether Dr. J. Wardenene had subjective knowledge of the objective medical emergency that my client, Claude Stephens, was facing on the day of August 4th, 2014. The district court found that there were no genuine issues of material fact regarding that element of a deliberate indifference claim, finding that Dr. J. Wardenene had, while incorrectly, had diagnosed my client as simply having gastrointestinal issues such as acid reflux on the day that he was actually experiencing hyperkalemia. So is your focus mostly on the time period when Dr. J. Wardenene evaluated and examined Mr. Stephens somewhere 1 to 1.30 on the day of his death? That's correct, your honor. And she signed him off to a nurse practitioner at 1.40 or so? Correct. She signed him off to a nurse practitioner, Awosika, before she left for the day. So we're really looking at about a half an hour to 10, 15 minute period? I mean, essentially what we're looking, well, I'd slightly disagree with that, your honor, because what I would say is that by virtue of her own testimony, Dr. J. Wardenene acknowledged that when she's working with a particular patient and she knows that there is an order for blood tests stat, which is what we have in this case, that her practice would be to ensure by the time that she left her shift, which we believe was around 5 o'clock on this day, that she would check for the results returning from the Detroit Medical Center laboratory. Just so I understand it, I thought she signed him over at 1.43. She did. Okay. She did, your honor. So she signs him over at 1.43. So Judge Cole's question, the window we're looking at is 1 to 1.43, but we could look at potentially 4.30 to 5 to help us inform ourselves. I would agree with that, absolutely. Okay. Yeah, I think the real crucial portion of this case is what occurred during that evaluation between Dr. J. Wardenene and my client, Clark Stevens, around 1 o'clock. If I could just follow up one thing. Oh, no, no. Just one question. So when she signed him off to the nurse practitioner, she did tell the nurse practitioner that the stat labs had been ordered, right? So Alicica knew that these labs had been ordered and should be coming in at some point on some sort of an urgent basis, right? She testified that she did inform someone when she left and she believes that it would have been the nurse practitioner she signed over my client to, that she informed them that there was an order for blood tests, stat, and to be on the lookout for those. Yes. Yes. Well, what instructions did she give whomever she signed the matter over to in terms of following up to get the lab results and once they got the results, what to do about them? Did she give any? I don't see that she gave any instructions. I'm not aware of there having been any instructions, Your Honor, and Brother Counsel may correct me on that, but from my review of Dr. J. Wardena's deposition, she seemed to be ascribing responsibility more so to the medical lab. She stated that the medical lab should have directed the blood test results to the nurse practitioner and that their failure to do that was what prevented proper treatment from occurring, but she wasn't putting onus on herself for having responsibility for communicating that to the nurse practitioner. I read two things in her depo, and you correct me if I'm wrong. She said it's routine for the medical lab to call the nurse's station and they would call the nurse's station when they got lab results, correct? Essentially correct. Depending on the type of lab results was my reading of her deposition. If it was lab results stat, as it was here, yes, that's correct. Okay. Well, that's what she said. She was testifying about these lab results in which hand. Then she said at pages 1822, 1823, I also told him, meaning Awosika, that we ordered stat labs, potassium, CBC, and to check on those. Then she said I told him over the phone, but I did make a notation when I signed him out. I don't have that before me right now, your honor. I was just looking for the page, but I trust that that is accurate, correct? Yeah. And so she did both according to her testimony. Okay. Yeah. You don't have any evidence to the contrary. I don't disagree with that, your honor. Did you depose Awosika? Awosika was deposed. Did Awosika say anything to the contrary? I don't believe Awosika did say anything to the contrary. Can I, Judge Blake, did you have another question? Can I go back to the question I was, I understand from your brief and the other side's brief that every episode of hyper, how do you pronounce it? Colemia. Colemia is distinct, right? Am I correct? Yes. It can present differently in different patients, and it can set in at different thresholds. And then you need, according to page five of your brief, and they agreed, and the literature I read agreed, that you need a lab to diagnose it? You need a lab to confirm that it's hypercolemia. That's correct. Okay. And so how, I'm trying to understand, the way I look at an objective component, and you tell me if I'm wrong, there's two ways to look at it. One is it's obvious to the layperson that a doctor should know. It's so obvious the bone is coming out of the arm. So everyone would know you got a broken bone. The second way is that a doctor, you have medical evidence that would tell a doctor. And here, at least as I understand, you should correct me if I'm wrong, there are like five or six symptoms, like tingling, numbness, muscle weakness, fluid retention, problems with fluid retention, and then nausea. And what your client had was nausea, but none of the others. And when the nurse checked his vitals, they were fine. And he said to the doctor that he was feeling okay. Well, he said to the doctor that he was experiencing nausea, and he had been experiencing nausea and bloating and other forms of indigestion since Saturday. Which is when he ate the beef or whatever. Exactly, correct. So your honor, the way you just laid out the objective standard, that's essentially consistent with what this court said in Blackmoor. But before this court had that discussion in Blackmoor, it started with the premise that this all comes from Farmer v. Brennan. And Farmer v. Brennan, when it's discussing what we now refer to as the objective component of a deliberate indifference case, simply said that the plaintiff has to show that there was a substantial risk of serious harm. Because Farmer v. Brennan, of course, didn't even deal with a medical emergency. It dealt with prisoner on prisoner abuse within a day. Right, but since then, right, we've interpreted, as you just alluded to, Farmer v. Brennan to have an objective and subjective component. And the objective component, I stated it accurately from my understanding of the case law. Tell me if I'm wrong. So there is case law that conducts the analysis that you just laid out, including Blackmoor. But what I would say is Blackmoor is actually an interesting case to consider this in the context of. Because Blackmoor, there was not any medical diagnosis until after the fact. The plaintiff in Blackmoor was complaining of nausea. He was vomiting, very similar to my client in this case. And it turned out that he had a ruptured appendix. That ruptured appendix wasn't confirmed until, I believe, it was two days after the initial complaints in the jail. And it was those initial complaints that formed the basis of the deliberate indifference claim. This court said that even though there was not a medical diagnosis in that case, the objective component was satisfied. And they implied that it was satisfied because of the obviousness. Right. And so you're not arguing obviousness here, that a lay person would know. Well, I actually am arguing, to a degree, obviousness. And I'm not actually conceding, first of all, that I do have to go down this two-pronged path. Because I would also say this court has published case law. One of them is a case that I believe Brother Counsel relied on, which is the Rouster v. Saginaw County case, which was my case. And I reviewed that opinion last night. And in that case, my client had a perforated duodenum from an ulcer. And sepsis set in, and he died a couple days later. What the court said in that case was, we know he had a perforated duodenum, that it led to sepsis, that it led to his death. That is certainly a serious medical emergency. So it satisfies. I think there's been this blending. And the Blackmore opinion, I think, is evidence of this. There's been this blending between the subjective and objective components in some of these cases. I acknowledge if Dr. J. Wardena didn't perceive what my client was experiencing, we have no cause of action. But I think that that's what the obviousness or the diagnosis goes to. It goes to that subjective element, not the objective element. And what I would say when it comes to... So you're narrowing the objective element either further to say, because the way our court has read it, is there's two ways to get through the gauntlet. And what you're saying is there's only one way, you have to have medical evidence. No, no. I'm not saying that, Your Honor. So you concede that the other way is obviousness? Well, I concede that this court has recognized the obviousness path and the medical testing path. What I would say is that I think that this case fits into an interesting area, because what we have is a medical professional who, she may not have a test on that day, in her hand at 1 o'clock. But what she does have is, I believe it's roughly nine months at this point, of treating Mr. Stevens, knowing that he has stage five renal disease, knowing that he has a history of being hyperkalemic, a history of hospitalizations for that, knowing that he's missing dialysis on Monday, and that missing dialysis is a risk factor for hyperkalemia. So she's bringing all of that knowledge to the table. She may not have a test in hand at 1 o'clock saying he's hyperkalemic, but she certainly has all of the circumstantial evidence in hand. And what Farmer v. Brennan says is that a plaintiff can satisfy the deliberate indifferent test, I believe the exact language is, in all the usual ways, including inferences drawn from circumstantial evidence. And in the passage where Farmer v. Brennan says that, it specifically says this is a question of fact. It's a question of fact based on that circumstantial evidence and the inferences that can be drawn. And so here, where Dr. Jaywardena has an extensive history with my client, he's exhibiting symptoms of hyperkalemia, and she knows he has a history of hyperkalemia, and he is now in a state where hyperkalemia is more likely because of the lack of dialysis. I believe that creates a genuine issue of material fact. Counsel, I'm not being very edified here. To determine if the objective component is satisfied, if the doctor should have known that he might have been suffering from hyperkalemia even in the absence of having gotten back the lab report, what is it that the doctor should have done? Should she not have left and gone home? Should she have given more explicit instructions to whomever was taking over and documented those instructions? After she left, should she have called back to the medical unit to monitor the situation? And has she done those things? If she failed to do something she should have done, then we would know maybe more obviously that she knew or should have known the problem medically. But how should she have managed the situation? Judge Clay, I would say at a minimum she should have done follow-up, but I believe that the burden actually was far more significant than that and attached earlier in time than that. I believe that she needed to refer my client out for dialysis to the hospital that day, Monday at 1 o'clock, when she knows his catheter is dislodged, when she knows he has a history of hyperkalemia, and she knows he's supposed to have an appointment that day and is experiencing nausea, which is a symptom of hyperkalemia. There's case law from this court, Blackmore is one of the opinions that says that a delay in treatment can be sufficient to satisfy the deliberate indifference test. That's essentially what Dr. Jaywardena did here. She said, I understand you need dialysis, it's Monday, you're supposed to have dialysis, I understand your catheter is dislodged, but rather than give you the treatment that you need today, I'm going to order that that treatment occur tomorrow. Now, the death is the natural result of that. And so, even though the lab results weren't in yet, because she knew that he needed dialysis at that moment, I believe that that's what required. In other words, even without the lab results, she nonetheless had ordered that he receive the dialysis the next day? Yes, she had ordered that, yes. So, which would suggest that she knew that he needed dialysis. My client received dialysis three times a week, every Monday, Wednesday, and Friday. And so, him missing a dialysis appointment is a, that's a significant event. As someone who has stage 5 renal disease and this history of hyperkalemia, the very purpose of dialysis for my patient was to remove potassium from his blood, which is what hyperkalemia is. It's the excess of potassium inside of his blood. So, yes, our argument is that she needed to get him dialysis that day. And this court also has case law, this is the Asplaw v. McConnell decision, which says that inadequate treatment can also be the basis of a deliberate indifference claim. And so, we don't need to demonstrate that Dr. Jaywardena intended for my client's death to occur or that she was approaching him maliciously. We simply have to show that the medical treatment was demonstrative of a disregard of her subjective knowledge of the seriousness of my client's medical emergency. Okay. Well, thank you, Mr. Desmond. Thank you, Your Honors. I know I don't have my time. You'll have your four minutes to rebuttal. No problem. Thank you. I appreciate it. Good morning, Your Honors. Ronald W. Chapman on behalf of Dr. Jaywardena. I think the facts here are extremely important. When talking about the dislodgement of the port in order to do dialysis, you would have to go back to, and you could go to 142, that's Exhibit A, page 131. At 1042, Dr. Jaywardena put together what's called a 407 requesting a radiology appointment to put in the catheter. Radiology is the only one that can put in a catheter. You don't just plug it back in. That was approved. She was scheduled to have radiology put that in. And missing one day is not that unusual, so she took that step. It's not like she could have put it in. You order radiology. It's to put in. The next step is that once... If they were fearful that he was about to have the onset of one of these incidents of hyperkalemia and they couldn't put the port in, they could have given dialysis by other means if they thought it was that urgent, couldn't they? They could have used a vein or proceeded otherwise, could they not? No, I believe they had to have a port. But your first statement I don't think is correct, Your Honor. On July 31st, his blood work was done. He did not have a potassium problem. He was not sick. I should interrupt you, but I thought this record showed that he was getting dialysis before they inserted, did the procedure to put the port in. In other words, there was another means of delivering the dialysis previously before that port was inserted. Is that correct or not correct? I don't believe that's true. I believe you need a port in order to deliver dialysis. That's my understanding. Yeah, if you could focus for the moment on that period between 1 and 143. Well, in that... And I guess, I know you maybe have other things you want to cover, but it seems like that's a critical time period and what Dr. J. Ordina should have done within the context of an Eighth Amendment claim in terms of treating this particular patient. And given his history of hyperkalemia, this catheter having come out, why didn't she send him over to the hospital? I guess that's the real question. I understand that he's got this history of reflux, he ate this spicy meal and all that sort of stuff. But given Mr. Stevens' history, I think the argument is that she should have, instead of signing him off at 143, to a nurse practitioner, should have sent him to the hospital. Well, I think the interesting thing to focus on is what did she know at 125 to 143? 143 is when she signed him off. And at 125, he came in complaining of bloating, complaining of a gastrointestinal issue. And I think the key fact there, if you look at 142, which is Exhibit A, page 136, which is medical record, he had all the signs of bloating and all the signs of a gastrointestinal issue. But one key thing, he also had bile in his colostomy bag. Bile in a colostomy bag is classic for a gastrointestinal issue, not for some issue that relates to or is part of potassium deficiency. So she had that. So there was very good understanding by her. It shows she had no ill will, none of the subjective intent that's necessary. He did have a gastrointestinal issue that also had an objective component of bile in his colostomy, or his osteopathy, in his ostomy bag that clearly showed or supported this particular fact. Now, she ordered- In terms of what we're concerned about here, isn't it? Medically? Well, I don't believe so. He did have a history of GERD. He had the objective facts that he ate the spicy food and these types of things. But we have to look at what did the doctor know at that time. The doctor had ordered staph potassium. That is the- I know standard of care doesn't apply here, but that's the standard of what a physician would do. She also had bile, or also identified he had bile, which confirmed, a good confirmation, that he did have a gastrointestinal issue, not a symptom of having hyperkalemia. She then takes the extra step. She orders his staph, and then at 143, she signs out. But what's critical, and I believe Judge Thaper mentioned this, is that on exhibit ECF 142, exhibit B, 23 to 24, the NPA acknowledged that received the order from him, or from the doctor, signed it out, understood that there were stat labs that were going to come in. And a nurse practitioner in Michigan has the status of being able to operate without supervision of a physician. This person knows what to do, knows to look for the stat, blood work to come in. Why did the doctor not document in the medical chart or other ways the instructions that she was leaving for this patient when she departed for the day? The record seems to be devoid of any- she claimed she talked to this nurse or nurse practitioner, but there's no indication of what she said or what specific instructions. So why does she not document that in the medical chart? I believe she does. On page 135, she identifies signed out to the PA. She then, in her deposition, explains- Well, your honor, I think we have to understand how medicine works and the status of a physician's assistant. A physician's assistant in Michigan has almost the same status of a physician. They have the right to practice medicine. So she signs him out- I had a life-threatening incident of- I had a life-threatening incident of a physician's assistant. He had a history of hyperkalemia that was acute. I wouldn't want to be practiced on by a nurse practitioner as the leading treater when I'm having- when there's the possibility of an episode lurking because the poor had come out and I'm not getting my dialysis and all that sort of thing. Well, with all due respect, I think the court is then deminimizing nurse practitioners and PAs. They have the right to practice medicine. They know how to treat this. And you both have the deposition of the Dr. J. Wadena, the deposition of the PA accepting the handoff, knowing what to do, that there are stat medical labs. And I will not accept the fact that the PA is not capable of and not charged with the duty to get those stat labs and then make a determination of what the potassium level is. Yes, Your Honor? I'm sorry to interrupt. Once they received the labs, who ordered what happened next at like 7.30 or whatever? I believe it was the PA, Your Honor. So the PA ordered all the things that happened thereafter? Yes. I'm sorry, go ahead. You can answer. No. So I think Dr. J. Wadena testified at some point in deposition that she would sometimes follow up with the results that came from the lab. I guess that maybe meant checking the fax machine or somebody somehow got the fax report over to her in healthcare. I'm not exactly sure how that happened logistically. Does the record reflect at all what her involvement was at the facility, you know, later in the afternoon? Like what time did she leave and did she do anything at all? I think her normal hours, I think she said was like 9 to 5 or something like that. Do we know whether she made any efforts to check on the lab results before she left? Maybe that doesn't make a difference, but just wondering. I can't answer that question, Your Honor. I don't know. I didn't prepare to have that directly in my... No, I'm just asking if the record reflects. I don't know. I didn't see anywhere in the record where it does. I don't believe so. And I don't believe there's a record of what she did. Other than attend to other duties. And I think what she's meaning when she would somewhat, when she would go to check the labs, even though the duty was for the labs to come in, the nurse to accept those labs and then report them, are patients that she hasn't signed off to someone else. And remember, we're looking for deliberate indifference here. I think it's acceptable for a physician to specifically sign a patient out to another quasi-physician that has the same duties, the same responsibilities under Michigan law to practice medicine, specific instructions that labs are, stat labs are out and look at those labs and then make a determination. So I guess that goes to my question. So after 143, when she signed Mr. Stephens off to the nurse practitioner, we really don't know, based upon the record, whether Dr. Jaywardena had any further contact with this particular case. Oh, I do know that. She had no further contact. And so she didn't do anything at all in terms of checking on lab results or anything of that nature. She signed, it was 143, that was it, and she moved on to whatever other responsibilities she had. That's true, Your Honor. And if we look at just the general practice of medicine, go to an ICU. A physician comes in, looks, orders labs, says, notify me when the labs come in. Or maybe that ICU physician leaves for the day, has a handoff to another ICU physician, or maybe a nurse practitioner, a PA, since they're significantly used these days, and then goes home for the day. We don't expect that ICU physician to continually come back and work 24-7 to make sure things were done. In medicine, you have to be able to rely on other competent people, nurses, nurse practitioners, PAs, to also carry out their duties. And we're looking at deliberate indifference. She had no subjective intent to harm this person. She wasn't obfuscating her duties. She wasn't walking away from a person. She gave specific instructions. In her deposition and in the PA's deposition, they both say the same thing. Yes, I knew that there were stat labs, and that I would then address them. There are no specific instructions that if you get stat labs, do this, because we don't know what the labs are going to say. And the labs are what directs then the treatment. And in this case, it directed the treatment of him going to the emergency room. And there was nothing else to be done. This is how medicine works. And it's a deliberate indifference case. In the following years, I understand if the numbers show up in a particular range from the lab, you know that the person has hyperkalemia. So, I mean, the doctor easily could have said if the lab results, if the numbers are within this particular range, here's what I want you to do. But none of that is documented or left by way of instructions in the record. Because that's not the practice of medicine today. PAs and nurse practitioners have the right to practice medicine without supervision. You mean everything is done verbally? When you say that's not the... It's not done verbally, Your Honor. It's written in the notes, signed off to PA Awosika. She specifically did that. And then she talked to him. Notes don't cover every little thing that's done. She signs him out. She brings him up to speed on what's going on. And the PA acknowledges that in his deposition. Says, yes, I understood. And what I meant by the stat labs, Your Honor, is we don't know what the potassium levels would be. Certainly, if they reach a certain level, you would send the personnel to emergency room, and that's exactly what happened. Let's take it a different way. Let's say she would have stayed on board. She would have called and said, hey, one of the labs, she would have known at 7 o'clock because the nurse didn't pick them up and didn't know. She would have done the exact same thing. Sent them to the emergency. Why did it take till... I'm just curious. This doesn't have to do with the doctor I recognize. Why did it take till 7 when the lab results... Till 7 to figure this out when the lab results came in at 4.30? I think that's the problem with the nursing staff. It's the problem with the nursing staff not picking that up. There are a lot of labs that come in. Remember, we're dealing with a pretty significant prison. There are a lot of labs, and this nurse is supposed to see those, when they're stat, identify them, and take them to the treator. Was there a negligence claim brought under Michigan law? No, Your Honor. It was straight 1983 case. So, to sum up, J.Y.D. did exactly what a medical provider should do. When she examined him, Mr. Stevens, he did not have the signs and symptoms of having a potassium problem. She then signed him out. She then, when the potassium came back, and when the PA was notified, sent to the emergency room. If you take the PA out of the mix, the same thing would have happened. Potassium levels would have come back. He would have been sent to the emergency room. It's the exact same thing, and she had no subjective intent. It's a deliberate indifference claim. It's not a negligence claim. They could have brought a negligence claim. Thank you, Your Honor. Okay, thank you, Mr. Chapman. Mr. Desmond, you have four minutes of rebuttal. Thank you very much, Your Honor. Mr. Desmond, can you focus on, just for a minute, before you dive in? So, let's assume there's an objective problem. We spent a lot of time on objectives. What is the evidence in the record that she actually drew the inference that there was a substantial risk? So, point me to evidence that the doctor herself drew the inference. So, I think part of it is what I was referencing before, which is her knowledge of his history, right? His knowledge of hyperkalemia. Does that mean every time someone has a history, the doctor has to draw that inference? Because that would be malpractice. If you have a history and you automatically assume it's something, that's improper. They have to go through the battery of tests. They do, Your Honor, but that is actually one of the other things that I would point to, because I think it's interesting that, you know, when you listen to attorney arguments and you hear what Dr. J. Wardena testified to, she says, oh, this was indigestion. He just needed Zantac. It was clear. But they ordered blood tests, stat, to figure out his potassium levels. That's not what her deposition says. Her deposition says she thought it was this. She ordered it to deal with it, but she also, as a precautionary measure, ordered the labs, which makes perfect sense as a doctor. You think it's A. You want to confirm it's not B. And everyone agrees the way you confirm it's not B is you order the labs. Go ahead. I'm sorry. No, Your Honor, and I don't think you and I necessarily disagree very much on that. I think part of this is more of a threshold question than a disagreement about the evidence. I would say that that does demonstrate a potential conclusion on Dr. J. Wardena's end that, you know, evidence, I'll put it this way, evidence that she is drawing the inference that maybe he is suffering from hyperkalemia. That's why I'm going to order this. But that's not standard. Let's go back to standard. That she actually drew the inference that a substantial harm, risk of harm to the inmate existed. And all you're saying is she had it on her mind. That's your best piece of evidence. In other words, what's your best piece of evidence? That's a better way of asking the question. Truthfully, Your Honor, it's her knowledge of his history, right? Okay, so that's it. That's the best, yes. If I went to my doctor, let me put it this way. If I went to my doctor today and I said, Doctor, I'm feeling kind of nauseous and a little bit bloated, I wouldn't expect my doctor to conclude it's hyperkalemia because I've never had a history with potassium issues. I'm not a dialysis patient. I'm not in Stage 5 renal disease. But Mr. Stevens is. She has that knowledge, and she's had that knowledge since roughly January prior to this August event. And so I think all of that evidence is very important. Oftentimes in deliberate indifference cases ---- to draw a subjective inference. In other words, that she actually drew the inference and disregarded it nonetheless. Well, I'm certainly using circumstantial evidence. I don't know if I would make a distinction between ---- But you're saying what she did is from that evidence, she decided he has hyperkalemia, but I'm not going to treat it. I'm going to disregard that risk. Yes, that is the argument, Your Honor. Or I'm going to delay treatment. Not that I'm necessarily going to completely disregard it because I don't have to show that the goal was to disregard it forever. Blackmore says that ---- You have to show that she consciously disregarded it. She consciously disregarded her knowledge that day. That's right. And oftentimes what happens in deliberate indifference cases is when you're trying to prove this subjective element, it comes down to, well, what did the defendant say? Did the defendant say during this case that I knew? And they don't. They never say they knew. They always say, well, this is unfortunate, but I didn't draw that conclusion. Well, she does say that, you know, she knew that he had this, you know, esophageal reflux condition, that he'd had this spicy food. She checked him. He didn't have bloating. He didn't have edema. You know, he was feeling pretty good, really. So it seems to be a little tough to draw the inference that you suggest that we can draw here. This is also a patient, Your Honor, from my recollection of the medical records. She had never once in her history prescribed Zantac for him or an over-the-counter gastrointestinal medication. She had referred him to the hospital on multiple occasions for hyperkalemia. So, yes, he says he was feeling okay, but this record also demonstrates in multiple instances that my client had been referred for mental health treatment on several occasions because of his refusal specifically of dialysis-related services where they had to explain to him that the consequence of not getting these services is potentially death, at which point he submitted and went to the hospital and got the necessary dialysis. So I think doctors are held to a little bit of a different standard. And I'd just very quickly like to say, Your Honors, and I understand I'm out of time, but there were multiple references to the fact that Dr. Jaywardena did not intend for harm to occur here. And I just want to say that that is not what the standard is. This is not an intentional tort claim. And Farmer v. Brennan makes it very clear that they didn't have to either intend the harm or intend that my client suffered the ultimate consequences that he suffered here. So that's not an allegation in this case, nor does it have to be. We appreciate that. Any further? Okay. Thank you very much. Thank you for your arguments, Mr. Desmond and Chapman. We really appreciate your arguments today, your briefing, and the case will be submitted. And you may call the next question.